## CONSTRUCTION OF A COKE CONTRACT ENTERED INTO DURING GOVERNMENT CONTROL.

### Common Pleas Court of Butler County.

THE DOMHOFF-JOYCE CO. v. THE HAMILTON FURNACE CO.*

### Decided, 1922.

*Contract for Sale and Purchase of Coke—Price to be Adjusted by Mutual Agreement In Case of Cessation of Government Control—Failure of Parties to Reach an Agreement—Contract Price Held Still in Force.*

To a written contract for the sale of coke at an agreed price was attached the following rider. "The price named in this contract is not in excess of that fixed by the U. S. government and should the U. S. government cease to regulate prices during the life of this contract, then the price of coke covered by this contract but not then delivered shall be subject to a revision to a figure to be mutually agreed upon by purchaser and seller."

Upon cessation of Government control the parties were unable to agree upon a new price.

*Held*—the contract price continued.

*E. A. Belden* and *Frank Brandon,* for plaintiff.
*Shotts & Millikin* for defendant.

HARLAN, J.

In this action plaintiff seeks to recover the sum of $174,565.33 with interest, for coke sold and delivered the defendant.

Defendant has filed a general denial, and by way of cross-petition claims damages in the sum of $502,494.41 with interest. A jury was waived and the case submitted to the court.

On February 25, 1920, plaintiff as the sales agent for its principal, Citizen's Gas Company of Indianapolis, entered into a written contract with defendant whereby it was agreed to sell and deliver to defendant one hundred and twenty-thousand (120,000) tons of coke, one-half of it to be furnace and one half egg size coke, of which there was to be delivered approximately six thousand (6000) tons of each kind per month from March

---

*Affirmed by the Court of Appeals.

l, 1920 to and including December 31, 1920 at the price of $8.89 per ton f. o. b. ovens, Indianapolis. This contract contained other provisions not necessary to be discussed now. There was a rider attached bearing the same date as the contract and containing a provision which is the storm-center of this controversy, the parties differing radically as to its construction. This provision reads as follows:

"The price named in this contract is not in excess of that fixed by the U. S. Government, and should the U. S. Government cease to regulate prices during the life of this contract, then the price of coke covered by this contract but not then delivered shall be subject to a revision to a figure to be mutually agreed upon by purchaser and seller."

Government control did cease on the 31st day of March, 1920. Coke was delivered under the contract during March, April and a part of May, the last shipment being made on the 20th of May. A few days after government control ceased, representatives of the parties met and endeavored to agreee upon a revision of price. These conferences continued more or less regularly for about a month, but ended in failure to agree upon a price. Plaintiff offered· to accept $12.50 per ton for furnace coke and $11.50 for egg coke, but this offer was refused and on May 10th plaintiff informed defendant it had sold the tonnage elsewhere at $13.00 per ton. However, as previously stated, shipments were continued until May 20th.

The plaintiff seeks to recover for the coke delivered; the major part of the claim is for coke delivered after government control ceased. On this plaintiff claims a reasonable price is $13.00 per ton.

The switchman's strike occurred in the early part of 1920— I believe in March and April—disrupting to a large extent the business of the company, especially as to freight shipments and deliveries. This strike together with a short car supply and other contributing causes made the market for coke and indeed for all other commodities very erratic for several months. In fact it was a seller's market. The defendant contends that under those circumstances it could not find any one who would en··

into a permanent contract for the sale of coke and it was compelled to buy spot coke to supply its needs.

The problem is to construe the contract—to discover the intention of the parties from the entire contract including the rider and in the light of the surrounding circumstances.

In substance plaintiff contends that by the rider the parties did not intend that the price named of $8.89 should prevail after the cessation of government control until a mutual agreement should be reached. That to so hold would make the rider meaningless because the parties always have the right to alter the terms of their contract. Plaintiff further contends that after Government control ceased, the price to be paid depended wholly upon agreement, and in the absence of agreement, remains indefinite and both parties are released from the contract. Plaintiff also contends that the defendant was the one that violated the contract by not making payments on the exact dates provided in the contract.

On the other hand defendant denies that cessation of government control *ipso facto* terminated the price named in the contract, and contends that if the parties were unable to mutually agree upon a new price, that the price of $8.89 still held.

What did the parties intend by the rider which provides that should the government cease to regulate prices then the price shall be subject to a revision to a figure to be mutually agreed upon by purchaser and seller?

The Standard dictionary defines "subject" when used with "to,"—"exposed to some agency or tendency," "liable to be affected"; Also, "actually placed or brought under."

Webster—"In the contingency of, dependent upon or exposed to" (some contingent action).

An example given is "a treaty subject to ratification."

That would not be equivalent to stating a treaty shall be ratified. It may or may not be ratified. Indeed the phrase leans to a contingent or permissive sense rather than to a mandatory one. The language is not tantamount to *shall be revised*. But if it stated *shall be revised to a figure to be mutually agreed upon by purchaser and seller*, there would still be the element

of mutuality in the matter. If the parties were unable to agree then the legal effect of the rider was *nil*. There is no provision that in case of inability to agree the price shall be fixed by a court, or by arbitration or by any other means. If the parties were unable to agree the rider was simply inoperative.

A number of authorities have been cited to the effect that where the price is left open and undecided and no means provided to determine it, there is no sale. The contract would be void and unenforceable because there would not be a meeting of the minds on one of the essential elements of a valid contract. There is no doubt that such is the law. These authorities are applicable only to the rider.

The real question in this case is "Did the parties intend that the cessation of government control should terminate the price named in the contract of $8.89? Neither the contract nor rider so state. To so hold the court would have to read something in the contract which the parties themselves did not place there. The court would be compelled to re-write the rider and say:

"Should the government cease to regulate prices during the life of this contract then *the price named in the contract shall be terminated,* and the price of coke not then delivered shall be subject to a revision to a figure to be mutually agreed upon."

The court can not make a new contract for the parties. The rider simply provided that the price shall be subject to a revision to a figure to be mutually agreed upon. But in case they cannot agree, what then becomes of the price named in the contract? Both the contract and the rider are silent.

In this situation there are some rules for the construction of contracts that are helpful. One is the contract must be considered as an entirety, and if possible construed so as to give effect to every provision thereof.

It must be kept in mind that the rider is simply a provision of the contract. Because it is attached as a rider does not give it any greater weight. Applying the above rule the court must consider that the contract contains a definite explicit provision for the sale of the coke for the entire period at a fixed price. This

provision must stand unless there is an inconsistency between it and the rider which will destroy it. There is no such inconsistency.

Another rule is that of two constructions that one will be preferred which will permit the contract to stand rather than fall, or as stated in Elliott on Contracts, paragraph 1520:

"That construction which sustains and vitalizes an agreement should be preferred to that which strikes it down and paralyzes it."

In this case the court is asked to so construe the rider as to cause the entire contract to fall.

Another rule is *"expressio unius est exclusio alterius."* The contract provides grounds of cancellation, as for instance if the buyer fails to make payments as they become due, or to receive coke as specified, or in the event the plant of either should be destroyed by fire or other accident. The court must presume the parties intended the foregoing to be the only grounds of cancellation.

There is no provision that the cessation of government control shall cancel the contract, nor that the inability of the parties to agree upon a revision of the price shall do so.

It is another rule of construction that the court will place itself in the position of the parties who made the contract as nearly as can be done by admitting evidence of surrounding facts and circumstances, the nature of the subject matter, also, the relation of the parties to the contract and the object sought to be established by the contract.   Under this rule it is very forcibly urged that the evidence shows that these parties entered into this contract with much circumspection; that Mr Sargeant came to Hamilton and looked over the plant of the defendant and saw its requirements and that the parties must have had in mind a contract that would not be terminated almost as soon as it was put into full operation.   The contract called for nearly all of the output of the Citizens Gas Company, and covered about 80 per cent. of the coke requirements for that period of the defendant.   It was a contract of large proportions and considered

mutually beneficial to both parties, and they must have contemplated that it would not be terminated lightly.

Another rule is where there exists an uncertainty or ambiguity as to the meaning of the terms of an agreement and the language used may be attributed to one of the parties hereto, it will be construed most strongly against the party using the language since he is considered as having chosen the language. Applying this rule, it was shown that the rider was a standard form placed by Citizens Gas Company in all of its contracts at that time. But while this is a well settled rule, the court does not give it as great weight as some of the others for the reason that while the language may have been supplied by the plaintiff, the defendant accepted it and it was inserted in the contract as the mutual agreement of both parties.

Briefly summed up, two alternatives are presented to the court. One would require the court to not only give the language a strained and unnatural meaning, but also to actually write into the contract something which the parties did not incorporate and let the contract fall.

The other would require the court to give the language of the parties its natural and ordinary construction and let the contract stand. The court for the reasons heretofore stated sees fit to follow the later alternative.

However, it is urged that the defendant violated the contract because it did not pay in accordance with the terms. Fifty thousand dollars was to be paid on the 25th of every month. The payment which was due of April 25th was not paid on that date, but was paid about three days later; the money was accepted and so far as the evidence discloses, no objection was made then. The court therefore holds that the plaintiff having accepted the money without objection waived its non-payment on the 25th. The balance for the April coke should have been paid May 10th but before that time the plaintiff had itself violated the contract by selling its tonnage to the Chicago Company, and on the 10th of May wrote the defendant informing it of its action. At no time did the plaintiff inform the defendant that it cancelled and rescinded the contract because the pay-

ments were not made in strict accordance with the contract, but the correspondence clearly shows that the sale of coke by the plaintiff to the Chicago company was because the defendant did not comply with the price laid down by the plaintiff.

The court holds the plaintiff violated the contract and is entitled to recover only the contract price of $8.89 per ton for the coke delivered, and the defendant is entitled to damages on its cross-petition. The rule for the defendant's damages is found in General Code 8447, and this amounts to approximately $515,-707.

NOTE.—On a motion for a new trial it was urged that although the defendant is entitled to damages, its claim exists against the Citizens Gas Company of Indianapolis, and can not be set up against the plaintiff. But the court held the defendant has a right to counterclaim, and inasmuch as the defendant's damages exceed the plaintiff's account, it will be held to compensate it.

The Citizens Gas Company was not a party to the contract, and hence the counterclaim can extend only to compensating the plaintiff's account.